**MISSOURI PACIFIC RAILROAD COMPANY, Appellant,**

v.

**J. D. CUNNINGHAM, Appellee.**

No. 15243.

Court of Civil Appeals of Texas, San Antonio.

May 8, 1974.

Rehearing Denied Nov. 20, 1974.

Thomas H. Sharp, Jr., Groce, Locke & Hebdon, San Antonio, Jacob G. Hornberger, Laredo, for appellant.

Helm, Jones & Pletcher, David H. Burrow, Houston, Mann, Castillon, Freed & Kazen, George P. Kazen, Laredo, for appellee.

CADENA, Justice.

This is a case arising under the Federal Employers' Liability Act (45 U.S.C.A. Sections 51–60). Defendant, Missouri Pacific Railroad Company, appeals from a judgment, based on a jury verdict, awarding plaintiff, J. D. Cunningham, $70,405.00 as compensation for injuries received by him in the course of his employment.

Defendant raises 48 points of error which, basically, raise the following: (1) Fausto J. Montemayor, one of the jurors, failed to truthfully answer questions propounded during the voir dire examination of the jury panel. (2) One of the jurors, Maria C. Vasquez, failed to answer truthfully questions propounded to the panel during voir dire examination. (3) The trial court erred in permitting plaintiff to invoke the rule after the trial had been in progress for one and one-half days, and ordering Henry J. Valdez, defendant's representative at the trial, to leave the court room. (4) The trial court erred in overruling defendant's objections to the charge and in failing to submit instructions and special issues requested by defendant. (5) There is no evidence or, in the alternative, insufficient evidence, to support the jury's answers to special issues.

Plaintiff's claim for compensation is based on an alleged back injury. During the voir dire examination of the panel, counsel for defendant asked the following question:

"You have been asked about prior experience with back injuries and I particularly want to go back into that a little bit. Have any of you ever had a prior claim for personal injuries where you made a claim for personal injuries, and this would include a Workmen's Compensation case, or are any of you receiving benefits from the Veterans' Administration for an injury sustained in the service or service-connected disability or automobile accident? Have any of you ever had occasion to make a claim for personal injuries sustained in any of the situations I have just described?"

Montemayor said nothing in response to this question, nor did he raise his hand or give any other indication that he wished to make any disclosure in response to the question. One member of the panel, Juan Hernandez, answered in the affirmative and was questioned concerning an automobile collision in which he had been injured. Another member of the panel, Maria Garcia, inquired whether the question included members of her family, and counsel for defendant replied that he would "get to your husband next." Counsel then asked if any member of the panel had had a claim made against him, and one of the panelists, Raymundo Rodriguez, answered in the affirmative but was not questioned. Counsel for defendant then asked the following question:

Have any of you or a member of your immediate family, husband or wife, or

parent or child, had occasion to make a claim for personal injuries against anybody, for Workmen's Compensation or against the Veterans' Administration for a service-connected disability?"

Again, Montemayor gave no indication that he had any information to give in response to the question. Two members of the panel, Mrs. Garcia and Mrs. Smith, answered that their husbands had suffered personal injuries and they were questioned by defendant's counsel concerning such injuries.

After the jury had returned its verdict and had been discharged, defendant discovered that Montemayor was receiving a pension from the Veterans' Administration for a service-connected disability. At the hearing on defendant's motion for new trial, Montemayor stated that he had been discharged from the armed forces of the United States in 1943 because he had suffered a "nervous breakdown" and had been receiving compensation since that date. Since 1966 he has been receiving compensation based on a 50 percent disability.

Montemayor was hospitalized at the Veterans' Administration Hospital in Waco from February 2, 1955, until November, 1955, having been committed to such institution as a result of an order entered by the County Court of Webb County. In November, 1955, the same court adjudged him to be of sound mind. In late 1965 or early 1966 he was again committed to the hospital in Waco for about three months. His discharge in 1966 was not followed by any order of the court relating to his mental competency. There is some evidence of a third sojourn in the hospital, apparently prior to 1965, but the record contains no details relating to this admission to the hospital.

Montemayor has not been hospitalized since 1966 and, at the time of the trial in 1972, was not under the care of a physician. The hospital records establish that his condition was diagnosed as "schizo-phrenia, paranoid type," and "manic depressive, psychosis."

At the hearing on the motion for new trial Montemayor testified that he heard the questions propounded by defendant's counsel, but that he did "not recall" being asked if he had received any benefits from the Veterans' Administration. He said he remembered the question relating to "personal injuries," including a "Workmen's Compensation case." However, he repeated that he did not recall hearing anything about veterans' benefits. He then stated that the question was not asked specifically of him, and explained, "I didn't make the claim, when I was in the service I was awarded this because I had a breakdown and I don't recall ever making claims against the government." At the time of the voir dire he knew that he was receiving veterans' benefits, but he "was thinking about back injuries and stuff like that, you know, injuries to the body not the mind." Finally, he said, "I never heard Veterans' Administration mentioned at all."

The record before us does not disclose any misconduct on the part of the juror, Montemayor. Counsel asking a question which is addressed generally to the entire panel must make certain that all members of the panel hear and understand the question. Barron v. State, 378 S.W.2d 144, 146 (Tex.Civ.App.—San Antonio 1964, no writ); 3 McDonald, Texas Civil Practice, Section 11.10.3, p. 154 (1970 rev.). Here, Montemayor testified that he did not recall a question inquiring as to the receipt of benefits from the Veterans' Administration. This is sufficient evidence to support the implied finding by the trial court that the juror did not hear the question. Barron v. State, *supra*.

In addition, the entire context in which the questions were asked supports the juror's interpretation of the general question as relating to personal injuries in general and back injuries in particular. The questions were, at least, ambiguous,

and in such a situation the interpretation placed by the juror on the question, if not unreasonable, will be accepted, and such a meaning will be attributed to the question. The evidence justifies the conclusion that the juror did not understand the question as meaning what counsel for defendant now says he intended the question to mean. P. T. Whitlock Gas & Oil, Inc. v. Brooks, 396 S.W.2d 922, 924 (Tex.Civ.App.—Dallas 1965, no writ); Red Ball Motor Freight, Inc. v. Cordova, 332 S.W.2d 753 (Tex.Civ.App.—Beaumont 1960, no writ); 3 McDonald, Texas Civil Practice, Section 11.-10.2, p. 153 (1970 rev.).

Further, the questions inquired about "claims" and the making of claims, rather than inquiring about prior injuries. The juror testified positively that the government awarded him the pension without his presenting a claim, and that he had never made a claim against the government. The fact that he was discharged in 1943, in the midst of World War II, at least indicates that the procedures leading to his discharge were initiated by the government. Under such circumstances, it is not surprising that our government, which initiated the discharge proceedings because of mental disturbance, would award a pension without requiring the presentation of a formal claim. In any event, there is nothing in the record to indicate that Montemayor ever made a "claim" for his disability. See P. T. Whitlock Gas & Oil, Inc. v. Brooks, supra, 396 S.W.2d at 924.

■ Finally, there is nothing in the record to indicate that Montemayor was in any way prejudiced against defendant. Rule 327, Texas Rules of Civil Procedure, expressly requires that where a party complains of an incorrect answer by a prospective juror on voir dire, a new trial may be granted if it appears from the evidence, both on the hearing of the motion for new trial and at the trial of the case, and from the record as a whole, that injury probably resulted to the complaining party. Defendant suggests that since Montemayor's mental disturbance six years before the trial was described as schizophrenia, "paranoid type," which suggests delusions of persecution, Montemayor would be prejudiced against some of the evidence presented by defendant. The particular evidence relates to the conduct of one of defendant's claim agents in releasing the air from the tire of plaintiff's car in order to be able to take pictures of plaintiff changing the tire. Even if it be assumed that Montemayor, at the time of the trial, was still plagued by irrational feelings of persecution, defendant's contention can most charitably be described as speculative. The record furnishes no hint as to the nature of the juror's delusions of persecution, other than his statements to the effect that he never felt that members of his family or officers of the law were "against" him.

■■ Defendant's contention that Montemayor was disqualified to act as a juror because of mental incompetency is without merit. As already noted, the order adjudicating the juror to be of unsound mind in 1955 was followed by an order of the court adjudging him to be of sound mind after his sojourn in the hospital. The order of the County Court of Webb County, dated October 5, 1965, is merely an order for temporary hospitalization for "observation and/or treatment." While this order recites that the court found Montemayor was "mentally ill," there is no finding that he was "mentally incompetent." Such order does not constitute a determination or finding of mental incompetency, and, therefore, does not create a presumption of mental incompetency. Article 5547–83, Vernon's Tex.Rev.Civ.Stat.Ann. In the absence of a presumption of mental incompetency and in the absence of evidence that Montemayor, at the time he served as a juror, was mentally incompetent, the presumption of mental competency must prevail and the implied finding by the trial court that the juror was mentally competent must be upheld.

Defendant's points 1, 2 and 3 are overruled.

■ Point 4 concerns the failure of one of the jurors, Maria C. Vasquez, to reveal, in answer to a question propounded to the panel generally by counsel for plaintiff, that she knew Dr. C. M. Canales, who testified in favor of defendant. Point 4 asserts that Mrs. Vasquez "failed to signify her prior unsuccessful treatment by" Dr. Canales.

Mrs. Vasquez, who works in a Laredo hospital, on one or two occasions asked Dr. Canales, at the hospital, concerning some discomfort caused by a congenital defect in one of her feet.

Dr. Canales suggested that she wear braces. Mrs. Vasquez ignored the suggestion. There is nothing in the record to suggest that Mrs. Vasquez consulted Dr. Canales formally, as distinguished from a casual conversation at the hospital. There is no evidence that Dr. Canales ever "treated" Mrs. Vasquez, successfully or unsuccessfully. The uncontradicted testimony is to the effect that Mrs. Vasquez did not follow his suggestion; that she considered him a good doctor; that she bore no feelings of animosity toward him; and that she did not discuss her dealings with Dr. Canales with any member of the jury. In brief, there is nothing in the record to suggest that Mrs. Vasquez was prejudiced against Dr. Canales.

It is true that in Dallas Ry. & Terminal Co. v. Kurth, 247 S.W.2d 930 (Tex.Civ. App.—Dallas 1952, writ ref'd n. r. e.), and Texas Employers' Ins. Ass'n. v. Wade, 197 S.W.2d 203 (Tex.Civ.App.—Galveston 1946, writ ref'd n. r. e.), it was said that where there is uncertainty as to the effect of withheld information on the mind of the juror, a new trial must be granted. But these statements were expressly disapproved by the Supreme Court in Childers v. Texas Employers' Ins. Ass'n., 154 Tex. 88, 273 S.W.2d 587 (1954). In addition, the amendment of Rule 327, T.R.C.P., to specifically provide that one seeking a new trial on the ground that a juror gave an erroneous or incorrect answer on voir dire

examination must show probable injury deprives *Kurth* and *Wade* of precedential weight.

Since defendant has made no showing of probable, or even possible, injury, point 4 must be overruled. City Transportation Co. v. Sisson, 365 S.W.2d 216 (Tex.Civ. App.—Dallas 1963, no writ).

■ Defendant's fifth point challenges the action of the trial court in granting plaintiff's motion, made pursuant to the provisions of Rule 267, T.R.C.P., that all witnesses, including Henry J. Valdez, the defendant's representative at the trial, be required to remain outside the court room. The motion to "invoke the rule" was not made until the first witness, plaintiff, had started his testimony, although the process of selecting the jury had begun the previous morning. Defendant asserts that defendant did not have available another employee equally familiar with the facts and problems of this particular case.

The record supports the conclusion that the motion to exclude Mr. Valdez from the court room was made as soon as plaintiff became aware of the fact that Mr. Valdez was to be a witness in the case. There is nothing in the record to support defendant's claim that no other representative or employee of defendant was available in Laredo, the site of the trial, who would have been able to sit in the court room and assist counsel for defendant.

■ Where a corporation is a party to a suit, the court, under the provisions of Rule 267, T.R.C.P., "may" exempt from the rule an officer or other representative of such corporation to aid counsel in the presentation of the case. While the mere fact that the corporate representative is to be a witness does not, of itself, require that he be excluded with other witnesses when the rule is invoked, the matter of excluding witnesses from the court room is left to the discretion of the trial court. The exercise of such discretion will not be disturbed in the absence of an affirmative

showing of injury. Southland Greyhound Lines, Inc. v. Matthews, 74 S.W.2d 713 (Tex.Civ.App.—Beaumont 1934, writ dism'd). In Texas & New Orleans Railroad Co. v. Ivey, 283 S.W.2d 78 (Tex.Civ.App.—El Paso 1955, no writ), an attorney who, as the railroad's claim agent, had done much of the investigative work on the case and who had signed defendant's pleadings, was called as a witness by plaintiff, who then invoked the rule with the result that the attorney was excluded from the court room, despite objection by defendant, who claimed that the attorney's presence in the court room, as attorney and as a consultant representing the corporation was needed. The court, while expressing disapproval of the trial court's action, said, "In the absence of an affirmative showing of injury by the complaining party we do not feel that we here have authority to review an act which lay within the judicial discretion of the judge." 283 S.W.2d at 82.

Since the record fails to disclose injury to defendant, point 5 is overruled.

Defendant next complains of the refusal of the trial court to instruct the jury, as requested by defendant, that the railroad "is not a guarantor or insurer of the safety of the place to work."

In connection with special issue no. 1, inquiring whether defendant failed to furnish plaintiff a reasonably safe place in which to do his work, the trial court instructed the jury that defendant was under "a duty . . . to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work and this duty was a continuing and non-delegable duty even though plaintiff's duties at the time and place in question may have been fleeting and infrequent."

The parties agree that the F. E. L. A. does not make a railroad an insurer against all mishaps that may occur to its employees, and that it is not unusual to find the instruction requested by defendant included in the court's instructions to a jury.

Mathes, Jury Instructions and Forms for Federal Civil Cases, 28 F.R.D. 401, 496 (1962). But the question before us is not whether the instruction requested by defendant is correct as an abstract statement of a rule of law, nor whether the giving of such instruction would have been erroneous. The question is simply whether, under the circumstances of this case, the refusal to give such instruction requires a reversal.

In Chicago, Rock Island & Pacific Railroad Co. v. Lint, 217 F.2d 279 (8th Cir. 1954), it was held that the trial court erred in denying the carrier's request that the jury be instructed (1) that the fact that plaintiff was injured did not, standing alone, render the railroad liable; (2) that the railroad was not an insurer against all mishaps that might occur; (3) that, in measuring the standard of care, the point of view to be taken should be that before the accident occurred, to see what, in the light of the facts then known, should have been anticipated; and (4) that in measuring the duty to anticipate and guard against possible mishaps, past experience respecting the device or situation in question may properly be considered.

However, it is clear that the holding in Lint to the effect that the court erred in not instructing the jury, among other things, that the railroad was not an insurer of plaintiff's safety is based on the appellate court's interpretation of all of the language of the charge, which was a general charge. This is clear from the Court's statement to the effect that the charge "could very easily give the jury the impression that they could find for the plaintiff if the gate was defective due to defective or insecurely fastened hinges, or if the premises were not reasonably safe, or, in other words, that the standard of care was to furnish safe gates and a safe place to work. The true measure of defendant's liability and its obligation in this case is to use the care a reasonable and prudent person would use under the same or similar circumstances in providing safe equipment

and a safe place to work." 217 F.2d at 286 (emphasis added).

Here, since the instruction was to the effect that defendant "was under a duty . . . to exercise ordinary care to furnish . . . a reasonably safe place in which to work . . .," it cannot be said that the instruction left with the jury the impression that the issue could be answered favorably to plaintiff if, in fact, the condition of the premises was dangerous. That is, the jury here was not told, as was the jury in *Lint*, that the standard of care was to furnish a safe place to work. The duty of defendant was expressly limited to an obligation to exercise ordinary care to furnish a reasonably safe place to work. The instruction delineated the scope of defendant's duty in terms of an obligation to use ordinary care, which is the correct scope of defendant's obligation under *Lint*. An instruction to the effect that a defendant is under a duty to exercise ordinary care cannot be said to leave the impression that defendant is an insurer of plaintiff's safety.

Since the instruction given correctly delimited the scope of defendant's duty, the failure to give the requested negative instruction was not reversible error. Almendarez v. Atchison, Topeka & Santa Fe Ry. Co., 426 F.2d 1095 (5th Cir. 1970); Atlantic Coast Line R. Co. v. Dixon, 207 F.2d 899 (5th Cir. 1953).

Point No. 7 assigns as error the refusal of the court to submit a special issue, timely requested by defendant, inquiring whether plaintiff, "on the occasion in question . . . failed to keep such a lookout as a person using ordinary care would have kept under the same or similar circumstances." The eighth point complains of the trial court's failure to submit defendant's requested causation issue relating to lookout.

The trial court submitted an issue inquiring whether plaintiff, as he "was stepping off the engine . . . failed to keep" a proper lookout, accompanied by an issue inquiring whether the failure of plaintiff to keep such a lookout was a cause of plaintiff's injuries. The jury answered the lookout issue in plaintiff's favor and did not answer the causation issue which was conditionally submitted.

Defendant asserts that the lookout issue submitted, which directed the jury's attention to plaintiff's conduct "when he was stepping off the engine," unduly limited the question of proper lookout. In order to understand defendant's argument, it is necessary to summarize the evidence relating to the manner in which the plaintiff was injured.

The accident occurred on July 11, 1971, while plaintiff was performing his duties as assistant hostler at defendant's railroad yard in Laredo. At the time he was assisting the hostler, Stover, to "spot" engine 148 at a location on the Volpe Spur track. When a train arrived at the yard, the engine was detached and stored, usually at a spot on the Volpe Spur. The engine which was to be parked or spotted was generally pushed by another engine operated by the hostler, with the hostler's assistant riding on the engine which was being pushed, so that he could direct the hostler and give the hostler the signal to stop. The hostler's assistant would then alight from the lead engine on which he was riding and uncouple the engines.

Immediately prior to the accident, plaintiff gave the signal to stop, and alighted from the engine. According to plaintiff, he did not step off the engine until it had stopped, but the hostler, Stover, testified that the engine was moving at a speed of about two miles per hour when plaintiff stepped off. At the place where plaintiff left the engine, there was about five feet clearance between the engine and the wall of a railroad warehouse. According to some of the testimony, the ground was rough in that area, there were several holes in the gound, and there was some oil on the ground. As plaintiff stepped off

the engine, his right foot came into contact with a discarded brake shoe and he slipped, falling backwards onto a telephone pole which was lying on the ground, covered by waist-high grass, near the wall of the warehouse. The evidence establishes that defendant's machinists customarily changed brake shoes in the area where plaintiff fell.

In stepping off the engine, it was necessary for plaintiff to descend some steps, holding on to "grab-irons" or hand rails with both hands, as required by the safety rules promulgated by defendant. As he descended the steps, plaintiff's back was toward the wall of the warehouse, with the body of the engine directly in front of him. Plaintiff testified that when he stepped from the last rung to the ground he looked to see where his right foot would come into contact with the ground. He did not "see any object or anything" on the ground. The evidence establishes that the discarded brake shoe on which his right foot landed was imbedded in the ground and covered with dirt.

Defendant argues that plaintiff's duty to keep a proper lookout began as the engine slowly approached the point at which the hostler, acting under plaintiff's directions, would stop the engines and plaintiff would step off the engine. That is, defendant insists that the issue was not merely whether plaintiff kept a proper lookout as he was stepping down to the ground, but whether he kept a proper lookout as he was approaching the "stepping off place."

In Traywick v. Goodrich, 364 S. W.2d 190, 191 (Tex.1963), our Supreme Court said that the lookout issue "should not be fragmentized." In *Traywick*, which involved an intersectional collision, the trial court submitted the general lookout issue, merely inquiring whether plaintiff had failed to keep a proper lookout "on the occasion in question," and also submitted an issue asking whether plaintiff had failed to ascertain, before entering the intersection, that the way was clear. The Supreme Court held that the second, more specific lookout issue, was "necessarily embraced within but not coextensive with" the general lookout issue. The Supreme Court's holding is merely an application of the rule that where the controlling factual issue has been properly submitted in the form of a general question, other issues inquiring into "various phases or different shades of the same" controlling issue should not be submitted. Rule 279, T.R.C.P.

The submission of the general lookout issue requested by defendant would have been proper. But since the broader lookout issue was not submitted, it cannot be said that the issue submitted inquired concerning a controlling element of an issue already submitted, as was the case in *Traywick*.

Since we do not have before us a case of double submission, the question is simply whether the lookout issue, as submitted, improperly narrowed the scope of *plaintiff's duty*. The critical issue in this case is whether or not plaintiff looked to ascertain whether the place where he stepped off the engine and onto the ground was safe. The submitted issue properly inquired as to plaintiff's conduct in this respect. There is no evidence which even tends to suggest that the danger would be discoverable by plaintiff if he had looked at the ground when he was ten or fifteen feet away from the place at which he alighted from the engine. Since defendant does not suggest that the manner of submission of the lookout issue affected the jury's answers to other issues, the error, if any, in the form in which the issue was submitted presents no ground for reversal.

Points 7 and 8 are overruled.

Point 32 assigns as error the failure of the trial court to sustain defendant's objection to the submission of a special issue no. 6, the lookout issue. In the trial court, defendant objected to the submission of this issue as worded "because the Special Issue was submitted with another issue that in-

quired as to whether [plaintiff] failed to keep such a lookout as a person of ordinary care would have kept immediately prior to stepping off the engine." The language in which the objection is framed makes it difficult to grasp the nature of defendant's complaint. One possible interpretation of the objection is that two lookout issues were submitted to the jury, that is, special issue no. 6 and another issue inquiring whether plaintiff kept a proper lookout "immediately prior to stepping off the engine." This is not true. Only one lookout issue was submitted to the jury.

Another possible interpretation of the language in which the objection is cast is that defendant requested the submission of two lookout issues, that is, special issue no. 6, which was submitted, and an additional issue inquiring as to plaintiff's lookout immediately prior to stepping off the engine, and that the court erred in not submitting both requested lookout issues.

█ Since it is impossible to determine from the objection whether defendant was complaining of the fact that the court submitted two lookout issues, or of the fact that the court failed to submit both lookout issues requested by defendant,[1] it cannot be said that the objection points out "distinctly the matter to which he objects and the grounds of his objection" as required by Rule 274, T.R.C.P. Further, whatever interpretation is placed on the language, the objection complains of something which did not occur.

In any event, in view of our holding to the effect that the submission of special issue no. 6 was proper, the overruling of defendant's objection to that issue does not require a reversal.

Points 9, 10 and 11 complain of the trial court's refusal to submit issues inquiring whether, "on the occasion in question," plaintiff was riding on the "footboard" of the engine and whether such conduct constituted negligence which was a contributing cause of plaintiff's injuries.

Even if the evidence raised an issue as to whether plaintiff was riding on the footboard of the engine or not,[2] it was not

---

1. The record reflects that defendant did not request the submission of two lookout issues. It requested only the submission of the question as to whether plaintiff failed to keep a proper lookout on the "occasion in question," which, of course, included the question of lookout immediately prior to the time that plaintiff stepped of the engine.

2. In his testimony, plaintiff said that he was riding on the "front of the engine." He testified that he was riding on what was known as "the footboard or the step of the engine, the step-well." When asked whether there was a difference between "the front of the engine" and the "step-well," he said, "It would be the stairwell of the engine," adding, "the footboard is on the outside but that is not where I was standing."

In his deposition, the hostler, Stover, said that plaintiff was on the "footboard." The pertinent portions of Stover's testimony at the trial are as follows:

"Q. Where was he riding, was he riding on the front of the engine or on the side on the stairwell or steps?
A. Well, the footboard I call it the steps, the steps I guess, yes, it would be the steps.

Q. Well, you mentioned the footboard, what do you call the footboard, the steps?
A. Yes, that's what I call the footboard, it could be referred to as the steps, they refer to the front of the engine as the footboard and the steps, I refer to them, I always call them footboard.
Q. Was he riding on the side as opposed to the front of the engine?
A. No, he was riding on the side of the engine where you get up to get on the engine, he was riding on the steps.
Q. So he was not riding on the front of the engine?
A. No.
        *       *       *       *       *
Q. Where was he riding, Mr. Stover?
A. He was riding on the steps of the engine, on the side of the engine.
        *       *       *       *       *
Q. Mr. Stover, doesn't the word 'engine footboard' refer to a definite part of the engine?
A. Not to my knowledge, I've always considered it . . .
Q. In the rules of the railroad . . . isn't the footboard specifically referred to several times?

error, under the circumstances of this case, to refuse to submit the "footboard" issues requested by defendant.

The footboard is a small metal platform on the front of the engine. Along the side of the engine there are some steps intended for use by persons who are getting off or on the engine. Alongside the footboard there is an iron rod or pipe, known as a "grab-iron." This grab-iron may be used for support by a person mounting, or dismounting from, the footboard. Along the sides of the stairwell there are two grab-irons for use by persons getting on, or off, the engine. A person alighting from the engine from the footboard will step onto the rail or the portion of the roadway between the rails. A person leaving the engine by way of the stairwell will step onto the ground lying adjacent to the rails. A person riding on the footboard has but a single grab-iron which he may clasp for support. A person riding on the stairwell may support himself by clasping two grab-irons, one on either side of the stairwell. It is clear that, while the engine is in motion, a person riding on the stairwell, since he has two grab-irons which he may rely on for support, is better protected from the dangers resulting from a sudden stop or slowing of the engine than would be a person riding on the footboard. It is also clear that a person leaving the engine via the stairwell would step onto the ground in an area outside the roadbed or the area between the rails, while a person dismounting by way of the frontboard would run the risk of stepping on one of the rails or on one of the cross-ties.

Rule 131 of defendant's safety rules, with which plaintiff acknowledged familiarity, states: "Employees are not permitted on footboard of engine or other equipment, except on bridge erection crane while working on bridges, . . . ." It is defendant's contention that since this rule was intended to protect employees in the same class as plaintiff, the violation of the rule by plaintiff would constitute causal negligence on his part and that, therefore, defendant was entitled to the submission of the issues requested.

■■■ A plaintiff's failure to exercise reasonable care for his own safety does not affect his cause of action unless his injury results from one of the risks which make his conduct negligent. Restatement, 2d, Torts Section 468 (1965); Green, Contributory Negligence and Proximate Cause, 6 N.Car.L.Rev. 3 (1927). That is, before a given course of conduct can be branded as negligent, back of the conduct must be found a duty, the observance of which would have averted or avoided the injury. Thus, the right of a motorist to recover for personal injuries suffered by him when his vehicle was struck by another vehicle from the rear while he was stopped in obedience to a traffic signal is in no way affected by the fact that his automobile had defective brakes. Nor is one who is driving at an excessive rate of speed contributorily negligent as to injuries suffered by

A. I don't know what they refer to.
Q. Are you saying that you are not familiar with the fact that there is a rule . . . that an employee shall not ride on the engine footboard except when working with a crane?
A. I am familiar with the word—you mean—the front of the engine is what it is called.
Q. You call the footboard the front end of the engine?
A. The front end, . . .
Q. But . . . there's no doubt in your mind, is there, that the footboard is that piece of metal that sticks out in front of the engine?

A. No, there's no doubt in my mind, but I've always called the footboard the steps too.

\* \* \* \* \*

Q. What did you mean when you used footboard?
A. I meant the steps.
Q. So did you use the terms interchangeably then?
A. I guess I do.
Q. Is there any question at all in your mind about where he was riding?
A. He was on the steps, he wasn't as they want to call it, he was on the steps of the engine because it was two units coupled."

him when a tree along the highway falls atop his car. See Prosser, Torts Section 34, p. 157, Section 51, p. 286 (1955); 2 Harper & James, Torts Section 22.10, p. 1230, Section 22.2, p. 1203 (1956). To take an example from an F. E. L. A. case, the statutory provision requiring a railroad to equip its cars with automatic couplers is intended to cover only the risk of injuries suffered by employees in the course of coupling operations, and not the risk of other casualties resulting from collisions or falls from trains. Note, 23 Minn.L.Rev. 102 (1938).

█ It is clear that the prohibition against riding on the footboard is intended to prevent injuries resulting from falling off the engine, or resulting from collisions, or from coupling operations, or from the fact that persons stepping off the footboard may step on a rail or cross-tie or, perhaps, rocks and stones which are not infrequently found between the rails. Here the plaintiff's injuries did not result from exposure to any such risks. Since plaintiff could not reasonably anticipate that, by riding on the frontboard, he would be exposed to the risk of injury resulting from a discarded brake shoe imbedded in the ground in the right-of-way outside the road bed, the question of whether he was riding on the frontboard or not becomes irrelevant and can affect neither his right of recovery nor the amount of recovery. It matters not whether this conclusion is expressed in terms of negligence or in terms of causation. See Waugh v. Suburban Club Ginger Ale Co., 83 U.S.App.D.C. 226, 167 F.2d 758 (1948).

Points 12, 13 and 14 question the legal and factual sufficiency of the evidence to support the jury's finding, in answer to special issue no. 1, that defendant failed to provide plaintiff a reasonably safe place in which to work.

In connection with special issue no. 1, the trial court defined "reasonably safe place to work" as such a place "as *an ordinarily prudent railroad* would have fur-nished its employees under the same or similar circumstances." (Emphasis added). Immediately following this definition, the court included an instruction to the effect that defendant ". . . was under a duty on the occasion in question to exercise ordinary care to furnish plaintiff with a reasonably safe place in which to work. . . ." In the trial court, defendant failed to object to the form of special issue no. 1 or to the accompanying definition and instruction.

The primary thrust of defendant's argument concerning the sufficiency of the evidence to support the answer to special issue no. 1 is that there is no evidence, or, in the alternative, insufficient evidence, to establish what "an ordinarily prudent railroad" would have done under the same or similar circumstances in order to furnish its employees a safe place to work. Our rejection of this contention does not imply an approval of the reference to an ordinarily prudent "railroad" rather than to an ordinarily prudent "person."

█ This is not the type of case in which a plaintiff whose claim is based on defendant's negligence must establish a standard of care by introducing expert testimony or evidence of custom or usage. Except where the matter to be dealt with is so esoteric that men of common judgment and experience cannot form a valid judgment as to whether the conduct of a party was reasonable, a jury is allowed to find negligence without evidence bearing on the applicable standard of conduct. James & Sigerson, Particularizing Standards of Conduct in Negligence Trials, 5 Vand.L.Rev. 697 (1952). In medical malpractice cases, for example, the courts have decided, correctly or not, that jurors or judges are not competent to judge whether or not a doctor has acted reasonably, and therefore, conformity to accepted practice among physicians has been adopted as a standard and proof of such standard is required. But even in medical malpractice cases, evidence of standard prac-

tices among physicians is not required where laymen are competent to determine whether the doctor has been negligent as, for example where plaintiff's claim is based on the physician's failure to sterilize instruments before an operation,[3] or where the physician resorted to clairvoyant diagnosis.[4]

In the ordinary negligence case, then, plaintiff is required to show only what defendant did, as distinguished from what defendant should have done. Judges and juries are competent to judge whether a person, including a railroad, has acted reasonably. Thus, in Missouri, K. & T. Ry. Co. of Texas v. Williams, 103 Tex. 228, 125 S.W. 881, 882 (1910), it was held that the question of the clearance required between a train and a mail crane is a matter which is within the jury's competence to decide. Similarly, it requires no particular expertise to conclude that "an ordinarily prudent railroad," like an ordinarily prudent person, should be required to anticipate the existence of an unreasonable risk of harm if a discarded brake shoe is permitted to lie, covered with dirt, in the right of way adjacent to the tracks in an area where it can reasonably be foreseen that employees will step in the process of alighting from rolling stock.

■ We conclude that the evidence is sufficient to support the finding that defendant failed to discharge its duty to its employee—a duty which the court, in the instruction given in connection with special issue no. 1, correctly limited to a duty to exercise "ordinary care." We also conclude that the evidence is sufficient to support the jury's answer to special issue no. 2, the causation issue. Points 12, 13, 14, 15, 16 and 17 are overruled.

Points 15 through 31, both inclusive, question the manner of submission of special issues 3, 4 and 5 and the legal and factual sufficiency of the evidence to support

the jury's answers to such issues. In answer to these issues, the jury found that defendant negligently failed to keep and maintain the right-of-way in a reasonably safe condition, and that such negligence contributed to plaintiff's injury.

■ Issues 3, 4 and 5 are, of course, primary negligence or liability-fixing issues. In view of the fact that the findings in response to issues 1 and 2 are sufficient to impose liability on defendant, the manner of submission of, and the jury's responses to, issues 3, 4 and 5 become irrelevant. Even if the jury had answered issues 3, 4 and 5 in defendant's favor, such findings would not defeat plaintiff's right to recover. Even if we sustained all of defendant's complaints concerning issues 3, 4 and 5 defendant's liability would remain unaffected. The errors, if any, committed by the trial court in the manner of submitting issues 3, 4 and 5, and the lack of evidence to support the answers to such issues cannot, therefore, be grounds for reversal. Under these circumstances, we feel no need to discuss defendant's points 15 through 31.

Point 32 has been discussed, and overruled, in connection with our considerations of points 6 and 7.

Defendant's last 16 points question the sufficiency of the evidence to support the answers to the issues relating to damages and embody the complaint that the damages awarded are excessive.

In answer to special issue no. 11, the jury awarded plaintiff $10,000.00 for past mental pain and suffering, $15,000.00 for future pain and suffering, $10,000.00 for loss of earnings in the past, and $35,000.00 for loss of future earning capacity. In response to special issue no. 12, the jury awarded plaintiff $405.00 for medical expenses incurred. This finding is not challenged by defendant.

---

3. Lanier v. Trammell, 207 Ark. 372, 180 S.W. 2d 818 (1944).

4. Nelson v. Harrington, 72 Wis. 591, 40 N.W. 228 (1888).

Plaintiff was discharged from the United States Navy in July, 1946. In July, 1947, he went to work for the Sante Fe Railway, remaining in that employment until November, 1948, a period of about 16 months, after which he worked for Missouri-Pacific Railroad for less than a year. For the next five years he worked around his father's farm, and then returned to work for the Sante Fe Railroad in December, 1953, remaining in this employment until July, 1954. He was then apparently idle for three months, returning to work for the Sante Fe in October, 1954, where he continued to work until June, 1956. He then worked for the El Paso Fire Department for four months, until he rejoined the Sante Fe in El Paso in October, 1956. This time he remained with the Sante Fe until June, 1964, a period of about seven years and nine months. After being without work for about seven months, he obtained employment with the Sante Fe in California in May, 1965, an employment in which he remained until April, 1967. From May, 1967, until January, 1968, he worked for a railroad in Del Rio. After two months of idleness, he rejoined the Sante Fe in March, 1968, and remained there until October, 1968. After being idle for nine months, he began working for defendant in Laredo in May, 1969. This employment continued until July 11, 1971, the date of his injury.

Plaintiff described his work for the railroads, including his work for defendant, as "labor." At the time he began working for defendant he was in good physical condition and had no difficulty performing his duties, such as climbing on and off engines, throwing switches and pulling pins. He had no difficulty bending, stooping, walking or running. During the time that he worked for railroads he was "cut-off" many times, but these lay-offs were routine, due to drops in the railroads' business, and had no connection with the manner in which he performed his duties. He testified that at the time of his injury he was earning approximately $800.00 per month.

The jury returned its verdict in this case on November 28, 1972, sixteen and one-half months after the accident. Plaintiff testified that he had been unable to work since his injury.

After his fall, plaintiff was taken to Mercy Hospital in Laredo, where he remained for nine days in traction and receiving injections and other medication. The hospital records reveal that he was suffering from "severe contusions, lacerations and sprain of the lumbosacral spine ligaments leading to excruciating back pain from a fall during his work." An entry in the hospital records dated July 15, 1971, four days after the injury, recites: "Patient seems negative in reactions, reluctant to say that he is better, objectively he is better."

When plaintiff was released from the hospital, he started in his automobile for his home in Brownwood. However, according to his testimony, he was experiencing so much pain in his back that he decided to stop in Del Rio, and went to see Dr. Gutierrez, whose name he picked out of the telephone book. This doctor gave him injections and medication which afforded him temporary relief, and, after a time, referred him to Dr. Canales in San Antonio. Dr. Canales saw plaintiff one time, September 8, 1971. Plaintiff then went to his home in Brownwood, where he was treated by a chiropractor until December, 1971, when he began to be treated by Dr. Gold, a medical practitioner.

Plaintiff testified that he experienced severe pains in his back which were only temporarily eased by medication. His pains kept him awake at night and made it impossible for him to perform the duties of any job for which he had any training. He experienced pain when he attempted to stoop, bend or lift. While plaintiff was in the hospital in Laredo, the attending physician prescribed use of a back brace. At the time of the trial plaintiff was still wearing the brace.

Dr. Canales, who examined plaintiff one time, testified that he found nothing amiss,

but admitted that his negative findings might be due to the fact that plaintiff, who had received cortisone injections and other medication from Dr. Gutierrez shortly before consulting Dr. Canales, was, insofar as his injury was concerned, in a state of remission.

Dr. Philip Gold, who had seen plaintiff 38 times between December 17 and the time of the trial, testified that x-rays showed some straightening of the normal lordotic curve. A radiologist stated that x-rays revealed straightening of the normal lordotic curvature of the lumbar spine, suggesting the presence of some muscle spasm. Dr. Gold testified that plaintiff experienced pain when he raised his leg; that his examination revealed spasms of the psoas muscle bilaterally; tenderness in the lumbosacral region; and Patrick and Leseque signs three plus positive bilaterally. His diagnosis included lumbosacral sprain and ligamentous tear of the lumbosacral region. Dr. Gold treated plaintiff with steroids, Norgesic, Robaxisal, physical therapy and exercises. He said that his prognosis was "guarded" and that, despite treatment, plaintiff had continuous pain. He described the outlook as "gloomy."

As already stated, Dr. Canales, who testified for defendant, testified that his single examination of plaintiff revealed no sign of continuing injury. There is also evidence which establishes that plaintiff made about 15 trips back and forth from Brownwood to Del Rio, a distance, round-trip, of about 500 miles. There is also testimony to the effect that on at least two occasions, after persons seeking to collect evidence for defendant had deflated the tires on plaintiff's car, plaintiff changed the tires without assistance, a chore which required stooping and squatting. On at least one of these occasions defendant's investigators were in a position to take motion pictures of plaintiff in the act of changing tires, and these motion pictures were introduced in evidence. Plaintiff testified that he experienced pain while changing the tires.

As is usual in cases involving claims of back injury, the evidence in the case is conflicting and, concededly, would support a finding that plaintiff suffered little, if any, serious injury. However, there is testimony to the effect that plaintiff, at the time of trial, was still experiencing severe pain which persisted despite treatment and the wearing of a back brace. The evidence relating to plaintiff's numerous automobile trips merely affects the credibility of his testimony. The same is true of the motion pictures showing plaintiff changing tires after defendant's investigators had deflated them. Considering the entire testimony, and honoring the jury's right to evaluate the testimony and to determine the credibility of the witnesses, it is clear that there is some evidence of serious and painful injury, and that such evidence is of such a nature that, if believed by the jury, it supports a finding of serious and painful injury. The verdict makes it clear that the jury chose to resolve the conflicts in the testimony in favor of plaintiff.

As Chief Justice Barrow, speaking for this Court, said in Missouri Pacific Railroad Co. v. Miller, 426 S.W.2d 569, 574 (Tex.Civ.App.—San Antonio 1968, no writ), with respect to compensation for pain and suffering: "Probably no other item of damage is more difficult to describe, define or reasonably compensate. . . . By its very nature the amount reasonably necessary to compensate an injured person for his past and future physical pain and mental anguish must largely be left to the discretion of the jury."

Despite the medical testimony to the contrary, the testimony of plaintiff and of Dr. Gold, as well as the entry in the hospital record and the testimony of the radiologist relating to evidence of presence of muscle spasm, support the conclusion that, from the date of his injury plaintiff has suffered severe pain. Unless we ignore this testimony, we cannot say that the award of $10,000.00 for more than sixteen months of pain is excessive.

With reference to future pain, there is testimony to the effect that despite almost a year-and-a-half of treatment, including physical therapy, the wearing of a back brace and the use of medication, plaintiff has continued to be plagued with pain. The failure of such lengthy course of treatment to alleviate the pain, together with Dr. Gold's testimony to the effect that the prognosis is "gloomy," is more than adequate to support the conclusion that plaintiff will continue to suffer pain in the future. There is nothing in the record which points toward the future amelioration of plaintiff's condition. The lack of such evidence is probably due to the fact that defendant consistently takes the position that there is nothing wrong with plaintiff. Again, it cannot be said that the award of $15,000.00 for future pain and suffering " . . . was not the result of a deliberate and conscientious conviction in the minds of the jury and court, or so excessive as to shock a sense of justice in the minds of the appellate court." Green v. Rudsenske, 320 S.W.2d 228, 235 (Tex.Civ.App.—San Antonio 1959, no writ).

The same is true of the award of $10,000.00 for the loss of past earnings. In view of the testimony to the effect that plaintiff had been unable to work for the preceding sixteen and one-half months, this represents compensation in an amount slightly in excess of $600.00 per month. There is sufficient evidence to support such award.

We now consider the award of $35,000.00 as compensation for loss of future earning capacity. As already pointed out, there is evidence of continuing future disability, and there is no evidence indicating the possibility of future rehabilitation.

Under the evidence, we cannot say that the award of $35,000.00 is excessive.

In its brief, in support of the contention that the verdict is excessive, defendant refers to instances of claimed jury misconduct. The alleged incidents of jury misconduct were presented to the trial court by allegations in defendant's motion for new trial. By overruling the motion for new trial, the trial court necessarily found that the misconduct did not occur. Defendant presents no point of error in this court challenging such finding by the trial court. We must, therefore, assume that the jury was not guilty of misconduct which affected their answers to the damage issue.

The judgment of the trial court is affirmed.